# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA
\* \* \*

| | |
|---|---|
| THOMAS X. KOTAB,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF THE AIR FORCE, *et al.*,<br><br>Defendants. | Case No. 2:18-cv-2031-KJD-CWH<br><br>ORDER |

Presently before the Court is Defendants' Motion to Dismiss (#11). Plaintiff filed a response in opposition (#15) to which Defendants replied (#16). Defendants also filed Notice of Supplemental Authority (#17) and Notice of New Screening Policy (#18).

## I. Background

The U.S. Department of Defense ("DoD" or "the Department") administers the enlistment of recruits into the Armed Forces. Consistent with 10 U.S.C. § 504, DoD permits the accession of recruits who meet certain citizenship or residency requirements or otherwise possess a critical skill or expertise. Among those permitted to enlist are U.S. nationals; lawful permanent residents ("LPRs"); and citizens from the Federated States of Micronesia, the Republic of the Marshall Islands, and Palau. Regardless of an enlistee's citizenship or residency, DoD conducts a background investigation to determine whether he or she meets certain suitability and security requirements and is otherwise qualified to serve.

Prior to October 13, 2017, DoD permitted U.S. nationals and LPRs to ship to basic training before completion of their background investigations. However, DoD subsequently determined it is not in the interest of the United States to permit LPRs' entry into service until their background investigations are completed. Thus, on October 13, 2017, DoD issued a

memorandum ("LPR Memo") providing that suitability and security determinations for LPRs must be finalized prior to these enlistees' entry into service. The LPR Memo primarily effects the timing of the enlistee's accession and not other terms on which LPRs enter service.

Also on October 13, 2017, DoD issued a memorandum pertaining to the expedited path to U.S. citizenship applicable to foreign enlistees ("Certification Memo"). Pursuant to the Certification Memo, the armed service (Air Force Reserve in this action) will not certify a service member's honorable service—a requirement for expedited naturalization—until that member has completed at least 180 days of active duty service, including completion of basic training. Such certification is made on USCIS Form N-426, a requirement for naturalization based on military service. See 8 U.S.C. § 1440(a).

On October 22, 2018, Plaintiff, a LPR who seeks to enlist with the Air Force, filed suit to challenge portions of the LPR Memo and Certification Memo (collectively, the "October 13 Memos"). Asserting claims under the Fifth Amendment to the U.S. Constitution and the Administrative Procedure Act ("APA"), Plaintiff seeks both declaratory and injunctive relief, including an order requiring revocation of the October 13 Memos.[1]

## II. Statutory Background

### A. 10 U.S.C. § 504

The Constitution assigns to Congress and the President the responsibility to establish the nation's armed forces and to employ them for the protection of the nation's security. U.S. Const. art. I, § 8, cls. 12-14 & art. II, § 2, cl. 1. Consistent with this authority, Congress has enacted legislation concerning who may, and who may not, serve in the Armed Forces. With respect to citizenship and residency, Congress has specified in 10 U.S.C. § 504(b) that "[a]person may be enlisted in any armed force only if the person is" (1) "[a] national of the United States"; (2) "[a]n alien who is lawfully admitted for permanent residence"; or (3) "[a] person described in section

---

[1] Plaintiff has joined a separate class action, Kuang v. U.S. DoD, No. 18-CV-03698 (N.D. Cal.), which challenges the timing of his shipment to initial entry training. While this case had been temporarily stayed on the basis that Plaintiff was going to be allowed to start training before his background check and certification had been completed, Plaintiff's entry into initial training has been delayed and the action is no longer stayed. Plaintiff, however, has agreed to join the class in Kuang and litigate those claims there. Only the Certification Memo is now before the Court.

341" of compacts between the United States and the Federated States of Micronesia, the Republic of the Marshall Islands, and Palau.10 U.S.C. § 504(b). Beyond a prohibition against enlisting individuals "who [are] insane, intoxicated, or a deserter from an armed force, or who ha[ve]been convicted of a felony," id.§ 504(a), Congress has provided no additional requirements or guidance concerning the enlistment of persons otherwise meeting the citizenship or residency criteria, see id.

Section 504(b), however, represents only the most recent Congressional pronouncement concerning who may serve in the military. That policy has varied widely for at least 120 years. For example, in 1894, Congress approved legislation providing that "in time of peace no person (except an Indian) who is not a citizen of the United States, or who has not made legal declaration of his intention to become a citizen of the United States, or who cannot speak, read, and write the English language, or who is over thirty years of age, shall be enlisted for the first enlistment in the Army." An Act To Regulate Enlistments in the Army of the United States, Chap. 179, § 2, 28 Stat. 215, 216 (1894). Approximately 50 years later, the Selective Service Act of 1948 authorized the induction of male aliens. Pub. L. No. 80-759, §§ 3-4, 62 Stat. 604, 605-606 (1948). In enacting that statute, Congress considered, but ultimately rejected, a proposal to authorize the temporary enlistment of aliens. See Conf. Rep. 80-2438,2012 (June 19, 1948). Shortly thereafter, Congress suspended the aforementioned 1894 statute and provided for the temporary enlistment of aliens into the Army, Pub. L.No. 81-597, 64 Stat. 316, 316 (1950). See also Pub. L. No. 84-149, 69 Stat. 297, 297 (1955); Pub. L. No. 85-116, 71 Stat. 311, 311 (1957).

In 1956, Congress passed comprehensive legislation regarding the Armed Forces, including the criteria for enlistment. Pub. L. No. 84-1028, 70A Stat. 1(1956). With respect to the Army, the statute provided that "[i]n time of peace, no person may be accepted for original enlistment in the Army unless he is, or has made a legal declaration of intention to become, a citizen of the United States." Id.§ 3253(c), 70A Stat. 178. The same restriction applied to the Air Force. Id. § 8253(c), 70A Stat. 503. Five years later, Congress amended these provisions to allow for the enlistment of LPRs. Pub. L. No. 87-143, 75Stat. 364, 364 (1961). As reflected in the legislative history, Congress enacted these provisions primarily to facilitate the enlistment of

those aliens who were inducted into the Armed Forces and who "desire[d]to … make a career of the military service," but "due to overseas assignment or other circumstances [were] unable to comply with the present law requiring an alien to show evidence or inclination to become a citizen prior to acceptance for enlistment." H.R. Rep. No. 86-1776 at 2 (June 9, 1960); see also Pub. L. No. 88-236, 77 Stat. 474, 474 (1963) (removing "declaration of intent" requirement). Congress enacted the current version of 10 U.S.C. § 504 in 2006, making uniform the citizenship and residency requirements across the Armed Forces. See National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163 § 542, 119 Stat. 3136, 3253 (2006).

While the value of LPRs' service in the Armed Forces is indisuputable, there are longstanding national security concerns associated with permitting aliens to serve in the military. In 1894, when a sufficient pool of potential soldiers could be found among U.S. citizens, Congress determined that "no consideration appears to justify the enlistment of soldiers in the permanent Army of the United States who may owe allegiance to some foreign and possibly unfriendly power." S. Rep. No. 53-151 at 3 (1894). And when Congress ultimately permitted aliens to enlist, both the Legislative and Executive Branches ensured that the military was conducting appropriate security screenings to address such concerns. S. Rep. 84-132 at 2 (1955) ("The alien enlistment program … did not go into effective operation on the date of the original enactment because of the very considerable period of time needed to perfect the screening arrangements and measures of coordination between the various Government departments concerned"); Hearing on S. 1137 Before the S. Comm. on Armed Services, 84th Cong. at 7 (Mar. 31, 1955) (statement of Maj. Gen. Donald P. Booth) ("In addition to the emphasis on quality, great care has been taken to insure the strictest possible security screening"); Hearing on H.R. 8122 Before the S. Comm. on Armed Services2456(July 2, 1957) (statement of Col. George A. Aubrey) ("[W]e have deliberately set high standards for enlistment under this program—higher than the standard for enlistment of American citizens … Only 1 applicant out of 9 has been able to meet the rigid mental testing and security screen criteria"). The record also indicates that the military resolved these security concerns prior to permitting aliens to enter into service. See Hearing on S. 1137 Before the S. Comm. on Armed Services (Executive Session), 84th Cong. 3

(Mar.31, 1955) (statement of Maj. Gen. Donald P. Booth) ("We have very carefully screened these people before we even permitted them to be enlisted").

LPRs can gain expedited citizenship under the provisions of 8 U.S.C. § 1439, which provides that LPRs who have at least one year of honorable service in the military may be naturalized without having to fulfill continuous residency requirements. However, during a period of declared hostilities, procedures for naturalization under 8 U.S.C. § 1440 take precedence over those under 8 U.S.C. § 1439. See DoD Instruction ("DoDI") 5500.14.[2] Pursuant to § 1440, enlisted aliens may apply for citizenship regardless of length of military service, provided they have "served honorably." 8 U.S.C. § 1440. "The executive department under which such person served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions[.]" Id.

B. Regulatory Background

DoD has promulgated regulations and issued directives regarding certain aspects of a recruit's entry into service. See generally 32 C.F.R. Part 66. For example, DoD regulations provide that it is the Department's policy to "(a) [u]se common entrance qualification standards for enlistment, appointment, and induction into the Military Services," and "(b)[a]void inconsistencies and inequities based on ethnicity, gender, race, religion, or sexual orientation in the application of these standards by the Military Services." Id. § 66.4. DoD has also promulgated regulations concerning basic eligibility criteria, including age, citizenship, education, aptitude, medical standards, physical fitness, dependency status, character and conduct, and history of drugs and alcohol. Id. § 66.6(b). The criteria regarding citizenship track 10 U.S.C. § 504. See 32 C.F.R. § 66.6(b)(2)(i) ("To be eligible for Regular or Reserve enlistment, an individual must meet one of the conditions outlined in 10 U.S.C. 504(b)[.]").

As relevant here, DoD's enlistment regulation also provides that "[t]he underlying purpose of these enlistment, appointment, and induction standards is to minimize entrance of persons who are likely to become . . . security risks." Id. § 66.6(b)(8). In furtherance of that goal,

---

[2] https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/550014p.pdf

a recruit will generally be deemed ineligible to enlist if he or she "[r]eceives an unfavorable final determination by the DoD Consolidated Adjudication Facility on a completed National Agency Check with Law and Credit (NACLC) or higher-level investigation, which is adjudicated to the National Security Standards in accordance with Executive Order 12968, during the accession process." Id. § 66.6(b)(8)(vi). The regulation nevertheless authorizes—but does not require—a recruit to enter into service prior to completion of the background investigation:

> (A) An applicant may be accessed (including shipping him or her to training or a first duty assignment) provided that a NACLC or higher-level investigation was submitted and accepted by the investigative service provider (Office of Personnel Management (OPM)) and an advanced fingerprint was conducted, and OPM did not identify any disqualifying background information.
>
> (B) If NACLC adjudication is not completed until after accession, any additional disqualifying information identified during the adjudication should be transmitted to the appropriate personnel or human resource offices, as determined by the Services, for appropriate action.

Id. § 66.6(b)(8)(vi)(A).

DoD has also issued guidance concerning enlistment standards. For instance, a DoD manual provides that the "enlistment . . . of each member of the Military Departments or their Reserve Components will be based on a favorably adjudicated [personnel security investigation]." DoD Manual 5200.02, "Procedures for the DoD Personnel Security Program (PSP),"§ 4.2(a) (Apr. 3, 2017). The DoD manual further states that "[t]he NACLC, or its equivalent, is the minimum investigation required for entry into the Military Departments." Id. § 4.2(b). With respect to security determinations, DoD relies on guidelines issued by the Director of National Intelligence. See Office of the Dir. of Nat'l Intelligence, Security Executive Agent Directive 4: National Security Adjudicative Guidelines (June 8, 2017). Those guidelines describe 13 areas for consideration of whether an individual presents "an acceptable security risk," id. at 6, including allegiance to the United States, foreign influence, and foreign preference, id. at 8-11.

Prior to October 13, 2017, DoD policy "allow[ed]for LPR recruits to ship to initial military training as long as their background investigation had been initiated, and they had cleared all other entry screening requirements." Also prior to October 13, 2017, the service

departments provided honorable service certifications in as few as one or two days after commencement of basic training.

### C. The October 13 Memos

On October 13, 2017, the Under Secretary of Defense for Personnel and Readiness issued a memorandum regarding military service suitability and security determinations for LPRs. See generally LPR Memo, attached to Complaint (#1). as Exhibit A, ECF No. 1-1. The LPR Memo required that, "effective immediately a Military Service Suitability Determination (MSSD) and National Security Determination (NSD) will be made prior to [a LPR's] entry into Active, Reserve, or Guard Service." Id. at 1. Once the LPR's background investigation is completed, "the DoD Consolidated Adjudications Facility (DoD CAF) will attempt to render favorable MSSD and NSD recommendations" by applying Directive 4. Id. The LPR Memo explained that the purpose of the new policy was grounded in national security concerns. See id. (issued to "facilitate process efficiency and the appropriate sharing of information for security risk based suitability and security decisions"). The LPR Memo did not affect the scope of the background investigation that LPRs undergo in connection with their enlistment. See id.

DoD also issued the Certification Memo on October 13, 2017. See generally Certification Memo, attached to Complaint (#1) as Exhibit B. That memo provides guidance regarding the certification of honorable service in support of a foreign-born service member's application for naturalization under 8 U.S.C § 1440. Id. With respect to service members in an active component, the memo instructs the component to certify honorable service on USCIS Form N-426 only if the member has "[s]uccessfully completed the basic training requirements of the armed force of which he/she is a member," "[c]ompleted at least 180 days of active duty service, inclusive of the successful completion of basic training," and "[t]he characterization of the member's service is honorable, as determined by the Secretary of the Military Department concerned." Id. at 2.

### D. Plaintiff's Complaint

On October 22, 2018, Plaintiff Thomas X. Kotab, proceeding *pro se*, filed the instant action against DoD; the Department of the Air Force; Heather Ann Wilson, in her official

capacity as Secretary of the Air Force; Anthony M. Kurta, in his official capacity as performing the duties of Under Secretary of Defense for Personnel and Readiness; and Stephanie P. Miller, in her official capacity as Director of Military Accession Policy. Complaint (#1)., ECF No. 1, at 1-2. Plaintiff alleges he is a LPR who seeks to join the Air Force Reserves. Id. at 5. According to Plaintiff, a recruiter from the Air Force Reserves "refused to present the enlistment document to me for signature, blaming the new policy [i.e., the LPR Memo]." Id. at 8. He further claims that, as a result of the October 13 Memos, he has suffered a variety of injuries, including the military "forever clos[ing] some doors in [his] future" and "prevent[ing] [him] from taking advantage of naturalization after one day of service." Id. at 5. In connection with these claims, Plaintiff asserts causes of action under the Fifth Amendment and the APA, id. at 3, and he asks the Court, *inter alia*, to "issue a judgment declaring the memos unconstitutional and illegal as applied to me and issue an injunction enjoining the defendants from enforcing and implementing these memos on me," Id. at 5.

III. Standard for a Rule 12(b)(1)

A Rule 12(b)(1) motion challenges a federal court's jurisdiction over the subject matter of the complaint. The party invoking the court's jurisdiction bears the burden of establishing that the court has the requisite subject-matter jurisdiction to grant the relief requested. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). A court must grant a Rule 12(b)(1) motion when, looking at the entirety of the complaint, its allegations fail to establish jurisdiction either facially or factually. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). While in a facial attack, all material allegations are taken as true, the court does not assume the truthfulness of the allegations in a factual attack and may review evidence beyond the complaint without converting the motion into one for summary judgment. In re Digimarc Corp. Derivative Litig., 549 F.3d 1223, 1236 (9th Cir. 2008).

To withstand a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" and "naked assertion[s]

devoid of further factual enhancement" are not sufficient. Id. at 678 (citation omitted). Rather, a court must disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and determine whether the remaining "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." Id. at 679; see also Zixiang Li v. Kerry, 710 F.3d 995, 998-99 (9th Cir. 2013).

IV. Analysis

    A. Plaintiff's Challenge to the Certification Menu is Non-Justiciable

Congress and the President are constitutionally responsible for establishing the nation's armed forces and employing them for the protection of the nation's security. U.S. Const. art. I, § 8, cls. 12–14 & art. II, § 2, cl. 1. "[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise[, and] [t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress and with the President." Schlesinger v. Ballard, 419 U.S. 498, 510 (1975) (internal citations omitted). Accordingly, courts extend great deference to the military when called to review the "'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,' which are 'essentially professional military judgments.'" Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008) (quoting Gilligan v. Morgan, 413 U.S. 1, 10 (1973)). As the Supreme Court has repeatedly emphasized, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." Gilligan, 413 U.S. at 10; see also North Dakota v. United States, 495 U.S. 423, 443 (1990) (noting that when confronted with questions relating to military operations, courts "properly defer to the judgment of those who must lead our Armed Forces in battle").

In some instances, including military personnel decisions, this deference requires that courts treat such challenges as non-justiciable, even where a constitutional claim is raised. See, e.g., Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953); Mier v. Owens, 57 F.3d 747, 749-50 (9th Cir. 1995); see also Voge v. United States, 844 F.2d 776, 780 (Fed. Cir. 1988) (noting that there are "thousands of … routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle

- 9 -

with"). In evaluating the justiciability of these challenges to military decision making, the Ninth Circuit has generally required that plaintiffs must first satisfy two threshold elements before a court can determine whether review of their claims is appropriate: (a) they allege a violation of a recognized constitutional right, a federal statute, or a military regulation; and (b) they have exhausted available intraservice remedies. Wenger v. Monroe, 282 F.3d 1068, 1072-1073 (9th Cir. 2002), as amended on denial of reh'g and reh'g en banc (Apr. 17, 2002) (citing Mindes v. Seaman, 453 F.2d 197 (5th Cir. 1971)).

If a plaintiff meets both of these threshold requirements, the court weighs four factors to determine whether judicial review of the claims is appropriate: (1) the nature and strength of the plaintiff's claim; (2) the potential injury to the plaintiff if review is refused; (3) the extent of interference with military functions; and (4) the extent to which military discretion or expertise is involved. Id. at 1073-75. The third and fourth factors are typically considered together. Id. at 1075.

Using this test, courts have found that challenges to the military's enlistment criteria are non-justiciable. For example, in Khalsa v. Weinberger, a member of the Sikh religion filed suit against the Army for not processing his enlistment application, because he could not comply with the Army's appearance regulations. 779 F.2d 1393, 1394-95 (9th Cir. 1985), reaff'd, 787 F.2d 1288 (9th Cir. 1985). Affirming the district court's dismissal, the Ninth Circuit held that the plaintiff's claims under the APA and the First and Fifth Amendments were not reviewable based on the four Mindes' factors. See id. at 1395-1400; see also Lindenau v. Alexander, 663 F.2d 68, 70 (10th Cir. 1981) (constitutional challenge to Army enlistment regulation prohibiting enlistment of unmarried parent was non-justiciable); West v. Brown, 558 F.2d 757, 759 (5th Cir. 1977) (same); Henson v. Alexander, 478 F. Supp. 1055, 1058 (W.D. Ark. 1979) ("the [enlistment] regulation embodies a great deal of military experience in matters of personnel and the military's decision is entitled to deference since the regulation relates to the efficiency of the Army and National Guard").

Although Plaintiff's allegations satisfy the two threshold Mindes' factors, they are insufficient to demonstrate that review is nevertheless appropriate here. Both the constitutional

and statutory claims with respect to the October 13 Memos raised by Plaintiff are unpersuasive. Accordingly, the first Mindes factor weighs against review. See Wenger, 282 F.3d at 1075. As to the second factor, Plaintiff claims that the challenged policies of the October 13 Memos would postpone his "immediate naturalization," "close some doors in [his] future," "deny [him] the opportunity to apply for federal jobs," cause "economic harm," and "meddle[] with [his] Pursuit of Happiness." Complaint (#1) at 5. However, with respect to the LPR Memo, compared to the harm suffered when a soldier is prematurely entrusted with access to military bases, equipment, and information –"the harm inflicted by the" delay in entering service "is negligible." See Harkness v. Sec'y of Navy, 858 F.3d 437, 444 (6th Cir. 2017); Harkness v. Spencer, 138 S. Ct. 2648 (2018); accord Schlanger, 586 F.2d at 671. Indeed, the Ninth Circuit has deemed the denial of entry into service, let alone the mere delay of such entry, to be a negligible injury under Mindes. See Khalsa, 779 F.2d at 1399-1400 (recognizing precedents "that give little weight to the injury flowing from denial of enlistment" and concluding that "[t]he district court did not err in holding that appellant will suffer little legally cognizable injury from having to choose another career"); see also Christoffersen, 855 F.2d at 1443-44; Sebra v. Neville, 801 F.2d 1135, 1142 (9th Cir. 1986).

Likewise, the delay of a derivative benefit such as expedited naturalization is not sufficient for purposes of Mindes. Cf. Lindenau, 663 F.2d at 74 (rejecting claim that "loss of benefits that go along with enlistment" weighed in favor of review). The third and fourth Mindes factors likewise weigh against review. Judicial intrusion into the military's judgment about when a recruit should enter into service and when such service can be certified as "honorable"— particularly when the military has not obtained and adjudicated the information necessary to assess any suitability or security risks—would amount to a significant interference. Cf. Sebra, 801 F.2d at 1142 ("Courts are properly wary of intruding upon [] sphere of military decision-making" regarding "deployment of troops and overall strategies of preparedness"). See generally Miller Decl., Def. Mtn to Dismiss, Ex. 1. The relief requested by Plaintiff would also require the Court to insert itself into the background investigation process—"an area in which the only compass is accumulated military experience," Lindenau, 663 F.2d at 74 -- essentially mandating

that the Department ignore the national security concerns that gave rise to the October 13 Memos. Wenger, 282 F.3d at 1076 (third and fourth factors weighed against reviewability where review would require the court to determine whether an investigation into events at a social function was properly conducted). Cf. Dep't of Navy v. Egan, 484 U.S. 518, 530 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."). Accordingly, the Court finds that Plaintiff's claims concerning the Certification Memo are non-justiciable, because the Mindes factors counsel against reviewability of Plaintiff's APA claim the claims surrounding the Certification Memo are dismissed.

### B. Plaintiff's Equal Protection Claim

"The Due Process Clause of the Fifth Amendment to the United States Constitution, which is applicable to the federal government, incorporates the Fourteenth Amendment's right to equal protection." United States v. Lopez-Flores, 63 F.3d 1468, 1472 (9th Cir. 1995). Like the Fourteenth Amendment, Fifth Amendment equal protection "guarantees no substantive rights or liberties"; instead, "it entrenches a right to be free from discrimination based on impermissible statutory classifications and other government action." Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005).

Courts evaluating equal protection claims apply one of three levels of scrutiny to a challenged law. Kahawaiolaa v. Norton, 386 F.3d 1271, 1277 (9th Cir. 2004). Generally, "[s]trict scrutiny is applied when the classification is made on 'suspect' grounds such as race, ancestry, alienage, or categorizations impinging upon fundamental rights such as privacy, marriage, voting, travel, and freedom of association." Id. Courts apply "intermediate scrutiny" if the challenged law discriminates on the basis of gender or certain other suspect classifications. Id. And "[w]hen no suspect class is involved and no fundamental right is burdened, [courts] apply a rational basis test to determine the legitimacy of the classifications." Id. at 1277-78.

Further, although "state classifications based on alienage are subject to strict scrutiny review," "federal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review." Korab v. Fink, 797 F.3d 572, 577-78 (9th Cir. 2014) (citing Hampton v.

Mow Sun Wong, 426 U.S. 88, 103 (1976)); accord Soskin v. Reinertson, 353 F.3d 1242, 1254 (10th Cir. 2004) (explaining that "the federal government can treat aliens differently from citizens so long as the difference in treatment has a rational basis" (citing Mathews v. Diaz, 426 U.S. 67, 78-83 (1976))). As the Ninth Circuit has explained, "Federal interests regarding aliens are significantly different than those of the states; immigration and foreign relations are paramount federal concerns … In the federal context, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State." Lopez-Flores, 63 F.3d at 1473 (citations omitted); see also Tovar v. U.S. Postal Serv., 3 F.3d 1271, 1288 (9th Cir. 1993) (Thompson, J., concurring in part and dissenting) (rejecting plaintiff's argument that regulation excluding temporary resident aliens from employment with the Postal Service was subject to strict scrutiny; "[t]his is clearly wrong, because only state laws that discriminate among groups of aliens receive such high scrutiny" (citing Mathews, 426 U.S. at 84-85)). Plaintiff cannot demonstrate that the October 13 Memos violate his right to equal protection with respect to either challenged policy.

The Court finds that rational basis review applies to Plaintiff's claims.[3] Moreover, rational basis review is appropriate because "lawful permanent residents are not a suspect class," De Medeiros v. Yates, No. 1:05-cv-00397, 2011 WL 386867, at *6 (E.D. Cal. Feb. 3, 2011) (citing Chavez–Perez v. Ashcroft, 386 F.3d 1284, 1292 (9th Cir. 2004)), because Plaintiff has no fundamental right to enlist in the Armed Forces, e.g., Dodson v. U.S. Gov't, Dep't of Army, 988 F.2d 1199, 1203-04 (Fed. Cir. 1993); Nieszner v. Mark, 684 F.2d 562, 564 (8th Cir. 1982); Lindenau, 663 F.2d at 72; West, 558 F.2d at 760; Williams v. United States, 541 F. Supp. 1187, 1192 (E.D.N.C. 1982), and because "there is no right to naturalization," Nio v. U.S. Dep't of Homeland Sec., 270 F. Supp. 3d 49, 62 (D.D.C. 2017). "A government policy is valid under the rational basis test so long as it is rationally related to a legitimate government interest." McLean v. Crabtree, 173 F.3d 1176, 1186 (9th Cir. 1999), as amended on denial of reh'g and reh'g en banc (Apr. 17, 1999). A court must uphold the challenged policy "if there is any reasonably

---

[3] The Court's review under rational basis is even more deferential than the arbitrary and capricious standard under the Administrative Procedure Act. See, e.g., Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell, 729 F.3d 1025, 1039 (9th Cir. 2013); People of State of Cal. v. FCC, 905 F.2d 1217, 1238 (9th Cir. 1990).

conceivable state of facts that could provide a rational basis for the classification." See <u>Aleman v. Glickman</u>, 217 F.3d 1191, 1201 (9th Cir. 2000); see also id. ("[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it."). An "imperfect fit between means and ends" is acceptable, and "[a] classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" Id. (citations omitted). "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of [the government's] choices.'" Id. at 1200 (quoting <u>Heller v. Doe</u>, 509 U.S. 312, 319 (1993)). Plaintiff cannot carry his heavy burden here.

With respect to the Certification Memo, requiring foreign national enlistees to complete at least six months of duty, including basic training, before an N-426 certification is signed, allows DoD to better evaluate whether such persons owe allegiance to foreign sovereigns prior to certifying their service as honorable, thereby providing them an expedited path to seek naturalization. See Certification Memo; Info Memo.

Two additional considerations buttress the Court's determination to uphold the October 13 Memos under rational basis review. First, doing so is consistent with the deference that courts have traditionally afforded the military in matters concerning the management of its internal affairs. Such deference is especially warranted given the Constitution's explicit grant of control over the composition of military troops to the political branches, see U.S. Const. art. I, § 8, cls. 12-14 & art. II, § 2, cl. 1, as well as the security-related concerns at issue, see, e.g., Egan, 484 U.S. at 528-29. Second, the function served by Defendant and enlisted members of the military is one that counsels in favor of sustaining the October 13 Memos under rational basis scrutiny. The Supreme Court has explained in a series of cases upholding state laws restricting aliens' ability to serve in law enforcement, rational basis review is appropriate because such positions fulfill "a most fundamental obligation of government to its constituency," <u>Foley v. Connelie</u>, 435 U.S. 291, 297 (1978), and a court's "scrutiny will not be so demanding where [it] deal[s] with matters resting firmly within a State's constitutional prerogatives [and] constitutional responsibility for the establishment and operation of its own government," <u>Cabell v. Chavez-Salido</u>, 454 U.S. 432,

439 (1982) (citation omitted). The enlisted soldier is tasked with protecting the national security of the United States from foreign threats, e.g., Schlesinger, 419 U.S. at 510, and limitations on who may fulfill that role—or, as here, when they may begin to do so and how much time they should serve before a determination is made that they have served honorably —"are so bound up with the operation of the" government that strict scrutiny is not appropriate, see Cabell, 454 U.S. at 439.

### D. Substantive Due Process Claim

Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997). The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim. Chavez v. Martinez, 538 U.S. 760, 775- 76 (2003). "[V]ague generalities . . . will not suffice." Id. at 776. And while in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiff must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience." Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8, 850 (1998). "It is not enough to allege conscience shocking action, however. As a threshold matter, to establish a substantive due process claim a plaintiff must show a government deprivation of life, liberty, or property." Brittain v. Hansen, 451 F.3d 982, 991 (9th Cir. 2006). Moreover, the Ninth Circuit has held that "a plaintiff can make out a substantive due process claim if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis." Engquist v. Or. Dep't of Agric., 478 F.3d 985, 998 (9th Cir. 2007), aff'd, 553 U.S. 591 (2008). But the court further limited this already narrow exception in the context of public sector employees, concluding that such employees may bring substantive due process claims only in "extreme cases, such as a 'government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his[.]'" Id. at 998.

Plaintiff has not met that standard, as the October 13 Memos do not prevent him from serving in the military or eventually reaping the benefits of that service by gaining expedited citizenship. See LPR Memo; Certification Memo. Additionally, Plaintiff has failed to establish that he is subject to a "government blacklist" or similar extreme measure, such that the Court should allow his substantive due process claim to proceed. See Engquist, 478 F.3d at 997-98. Further Plaintiff is unable to adequately state a substantive due process claim, as courts have consistently held that there is no constitutional or statutory right to enlist in the Armed Forces, even for U.S. nationals. The Court has already found that the October 13 Memos withstand rational basis scrutiny. Plaintiff has therefore failed to state a substantive due process claim, and this claim is dismissed.

### E. Claims under the APA

The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'" Lincoln v. Vigil, 508 U.S. 182, 192 (1993) (quoting 5 U.S.C. § 701(a)(2)). Such decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas. Heckler v. Chaney, 470 U.S. 821, 830 (1985); e.g., Adams v. FAA, 1 F.3d 955, 956 (9th Cir. 1993); City of Santa Clara. v. Andrus, 572 F.2d 660, 666 (9th Cir. 1978). Moreover, review is particularly inappropriate where "the subject matter is 'an area of executive action in which the courts have long been hesitant to intrude.'" Helgeson v. Bureau of Indian Affairs, 153 F.3d 1000, 1003 (9th Cir. 1998) (quoting Lincoln, 508 U.S. at 191). And even though § 701(a)(2) stakes out "a very narrow exception," see, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971), "the Supreme Court has indicated that the § 701(a) hurdle must be cleared 'before any review at all may be had' under the APA," E.J. Friedman Co. v. United States, 6 F.3d 1355, 1359 (quoting Heckler, 470 U.S. at 828).

#### 1. DoD's Determinations Regarding Honorable Service Are Not Reviewable.

The policy reflected in the Certification Memo is not reviewable under the APA. The statute governing DoD's honorable service certifications sets forth no meaningful standard to

evaluate either whether DoD should certify a soldier as having served honorably or when DoD should so certify. The relevant provision states that "[t]he executive department under which such person [seeking naturalization] served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions." 8 U.S.C. § 1440(a). This language contains no further guidance or instruction as to what constitutes "honorable" service for purposes of certification, thereby conferring discretion on the relevant military branch. Notably, the statute does provide some guidance as to what does not constitute honorable service, see id. (stating that persons who have been separated on account of alienage or who were conscientious objectors who "performed no military, air, or naval duty whatever or refused to wear the uniform" cannot be certified as having served honorably), but DoD retains discretion to determine, as an affirmative matter, what type of service suffices as "honorable." Indeed, to the extent the statute offers any guidance regarding what type of service should be certified as "honorable," it suggests that a soldier must have completed active-duty status, id. (instructing the relevant branch of the military to "determine whether persons have served honorably in an active-duty status"), which Plaintiff has not done. Congress's silence as to what type of conduct should be deemed "honorable"—which, like "enlist," constitutes a military term devoid of qualification—signals that such a determination is left to the prerogative of DoD. Nor did Congress provide any standard for determining when DoD should certify that a soldier has served honorably. The relevant statutory language is written in the past tense, see id. (instructing DoD to determine whether such persons "have served honorably"), suggesting that certification need not necessarily occur concurrent with a soldier's enlistment. Further, the statute permits DoD to make an honorable service determination following a soldier's separation from the military. See id. (instructing DoD to determine whether a person has served honorably, "and whether separation from such service was under honorable conditions"). Having imposed no time restrictions for DoD to abide by in certifying honorable service, § 1440(a) leaves the pace of certifications within the discretion of DoD. See, e.g., Roberts, 792 F. Supp. 2d at 73-74. The legislative history confirms that Congress left the construction of the term "honorable service" to the agency charged with making

honorable service determinations. The Nationality Act of 1940, which authorized naturalization for persons serving in the Armed Forces, required proof of honorable service "by duly authenticated copies of records of the executive departments having custody of the records of such service." Pub. L. No. 76-853, § 324(e), 54 Stat. 1137, 1150. Yet the INA, enacted in 1952, amended this requirement, mandating that noncitizen soldiers submit a certified statement from the executive department under which the soldiers served, affirming that their service was honorable (essentially the same rules that apply today). Pub. L. No. 82-414, §§ 328(b)(3), 329(b)(4), 66 Stat. 163, 249-50. This shift in the law reflects Congress's intent to give the military departments an active role in determining honorable service, and it undercuts any notion that the role is ministerial. If Congress had viewed the honorable service determination as pro forma, Congress could have simply retained the straightforward proof-of-service requirement from the 1940 Act.18 Therefore, the Court dismisses Plaintiff's APA claims pursuant to Rule 12(b)(6).

V. Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss (#11) is **GRANTED**.

IT IS FURTHER ORDERED that the Clerk of the Court enter **JUDGMENT** for Defendants and against Plaintiff.

Dated this 25th day of September, 2019.

_____
Kent J. Dawson
United States District Judge